IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BARRY WHITMORE, | § | |
| | § | No. 386, 2018 |
| Respondent Below, | § | |
| Appellant, | § | Court Below: Family Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | Petition No. 17-18582 |
| MICHELLE ROBINSON, [1] | § | File No. 17-06-07TN |
| | § | |
| Petitioner Below, | § | |
| Appellee. | § | |

Submitted: September 11, 2019
Decided: December 2, 2019
Corrected: December 3, 2019

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, Justices; **MEDINILLA**, Judge,[2] constituting the Court *en Banc*.

Upon appeal from the Family Court. **REVERSED** and **REMANDED**.

Timothy J. Snyder, Esquire, and Curtis J. Crowther, Esquire (*Argued*), Young Conoway Stargatt & Taylor, LLP, Wilmington, Delaware, for Appellant, Barry Whitmore.

Andrew W. Gonser, Esquire, Gonser & Gonser, P.A., Wilmington, Delaware, and Achille C. Scache, Esquire (*Argued*), Giordano, Delcollo, Werb & Gagne, Wilmington, Delaware, for Appellee, Michelle Robinson.

**VAUGHN**, Justice:

---

[1] A pseudonym was assigned to each party on appeal pursuant to Supr. Ct. R. 7(d).
[2] Sitting by designation under Del. Const. art. IV, §12.

The appellant, Barry Whitmore (the father), appeals from a Family Court order granting the petition of appellee, Michelle Robinson (the mother), to terminate his parental rights to their now eight-year-old child, C.R. His rights were terminated under 13 *Del. C.* § 1103(a)(5) for his alleged failure or inability to plan for the child's physical needs or mental and emotional health and development. The father brings four claims on appeal. The first is a claim that the Family Court committed legal error when it applied the definition of "necessary care" in 10 *Del. C.* § 901(17) as part of its analysis of the criteria which must be shown to justify termination of parental rights under 13 *Del. C.* § 1103(a)(5). The other three claims challenge the sufficiency of the evidence.

We have concluded that the father's first claim has merit. In order to terminate parental rights under 13 *Del. C.* § 1103(a)(5), the Family Court must find that the parent is "not able, or [has] failed, to plan adequately for the child's physical needs or mental and emotional health and development." It is evident from the Family Court's opinion that the court applied the definition of necessary care contained in Title 10 as the "relevant definition" in assessing whether the father had failed to plan for his child under 13 *Del. C.* § 1103(5). The definition of necessary care, however, applies only in Chapter 9 of Title 10. It is not one of the criteria governing whether parental rights should be terminated under 13 *Del. C.* § 1103(a)(5). The Family Court's use of the definition of necessary care as a factor in determining whether the

2

father failed or was unable to plan for the child was material legal error requiring reversal of the Family Court's judgment and remand for further proceedings.

## I. Facts and Procedural History

C.R. was born on September 17, 2011. The mother and the father resided together with C.R. first at the maternal grandmother's home and then at the paternal grandmother's home until January 2012, when C.R. was four months old. The mother and C.R. then moved back in with the maternal grandmother, and the father moved to an unknown location. Four months later, in May 2012, the father moved back in with the paternal grandmother. From May 2012 until July 2013, the father had regular contact with C.R. In August 2013, the mother and the father moved into an apartment together with C.R. Around September 17, 2013 (C.R.'s second birthday), the mother found evidence of the father's drug use (needles in a pouch under the bed) and moved out. The father stayed at the apartment for a couple of months. From December 2013 to early 2014, however, his residence was unknown. He may have lived with his father or a girlfriend, but he eventually became homeless due to his heroin addiction.

The father was placed under a child support order on February 26, 2014, at which time he was unemployed. That order reflected that he had "prospective employment."[3] He had not provided financial support to the mother for C.R.

---

[3] Appellant's Opening Br. Ex. A at 17 [hereinafter *Termination Op.*].

between September 2013 and February 2014. He paid support for about three months after the order was entered but then stopped. At the time of the termination-of-parental-rights hearing (TPR hearing), he was $9,800 in arrears on his child support obligation. By May 2014, he was active in his drug addiction and had lost his job and housing.

The father saw C.R. approximately ten times between September 2013 and August 19, 2014,[4] when he was arrested and incarcerated for armed robbery. He then had no contact with C.R. for six to eight weeks. From late September or early October 2014 until August 27, 2015, he had, at most, two phone calls per week with C.R.

The mother indicated that she wanted to stop all contact between the father and C.R. sometime around the end of August 2015, when the father told her that he faced up to twenty years in prison.[5] "Since September 2015, the mother has not wanted the father to have contact with C.R. or receive cards, presents, or letters from him."[6] As a result, the father has not had any contact with C.R. since then. The mother learned of the father's actual sentence (more than ten years) in October 2015.

---

[4] To the extent the testimony differed as to the frequency of the father's contact, the Family Court found the mother's account more credible than both the father's and the paternal grandmother's because the father was using drugs (while the mother was not) and the paternal grandmother's testimony on this subject was simply a reflection of what the father had told her. *See id.* at 6 n.13, 16 n.23.

[5] *Id.* at 7-8.

[6] *Id.* at 18.

At the time of the TPR hearing, his scheduled release date was February 2028. Although the father testified that he last had contact with C.R. by telephone in October 2015, the Family Court found that the last contact was in September 2015.

The father filed a petition for visitation in December 2015, but it was returned to him due to a procedural irregularity in the petition. He then refiled his petition on February 9, 2016. On December 19, 2016, following an unsuccessful mediation, an interim visitation order was entered granting the father telephone and mail contact with C.R. at the mother's residence and the paternal grandparents' residence when C.R. was in their care.

On January 3, 2017, the mother filed a motion and affidavit seeking an emergency *ex parte* order to stop the contact ordered by the interim order until after a hearing on the merits.[7] Among the allegations contained in the motion was an allegation that, "Based on Facebook postings it appears that Father is involved in a gang while in jail and his behavior continues to be inappropriate and questionable."[8] Another averment was that C.R. "ha[d] developed a close relationship with the mother's fiancé," S.L.[9] The Family Court granted the motion the next day, with the contact stayed pending a hearing on the father's petition for visitation. In this appeal the father has argued that the mother's allegation concerning the Facebook posting

[7] *Id.* at 3; App. to Appellant's Opening Br. at A350-57.
[8] App. to Appellant's Opening Br. at A350.
[9] *Id.* at A351.

5

was untrue; in fact, at the TPR hearing, the Family Court judge observed that "I have no evidence that it [wa]s a gang sign."[10]

Approximately January 16, 2017, the father filed a Petition for Rule to Show Cause, which asked that "the court order be enforced as it was ordered" and that the mother have C.R. available for phone contact as the interim visitation order stated.[11] The record does not seem to indicate what action, if any, the Family Court took on that petition.

The father's petition was finally heard on April 20, 2017. Relying on 13 *Del. C.* § 728(d), which applies to visitation "to be conducted in a correctional facility," and its determination of what was in C.R.'s best interests, the Family Court denied the father's petition for visitation and ordered that "he not write or call [C.R.] until [C.R.] is eight-years old and has been told by Mother about Father."[12] Effectively, in other words, the father was ordered to have no contact with C.R.

In response to a petition for visitation filed by the father on December 11, 2017, the Family Court amended the order to provide that "Mother shall send to

---

[10] *Id.* at A277:15-16; *id.* at A277:18-19.
[11] *Id.* at A359.
[12] *Termination Op.* at 5. In its decision denying the father's petition for visitation, it appears that the court also relied, in part, upon testimony from the mother that she had had spoken to a counselor who advised her that C.R. was too young to be told about his father. At the TPR hearing the mother appeared to contradict herself by testifying that she had not consulted with any mental health professionals about C.R. being told about his father. The Family Court order denying the father's petition for visitation was not appealed. We have never held that 13 *Del. C.* § 728(d) can be construed as authorizing the Family Court to order no contact between a child and an incarcerated parent.

father, yearly on May 1, a letter noting [C.R.'s] physical health, educational status, and general well-being."[13]  The record does not reflect that such a report was ever sent.

The record indicates that the paternal grandparents exercised some visitation with C.R. which continued after the father's incarceration.  When the mother decided to end contact between C.R. and the father in September 2015, however, she conditioned continued visitation with the paternal grandparents on their not talking with C.R. about his father.  On July 26, 2016, the paternal grandparents filed their own petition for visitation.  Their petition was consolidated with the father's petition for visitation and both were scheduled to be heard together on April 20, 2017.  At the start of the hearing on the grandparents' petition, the mother, father and paternal grandparents consented to a schedule of paternal grandparent visitation which was approved by the court. Among the provisions of the order was one that "At no time prior to [C.R.]'s eighth birthday shall Grandparents discuss with [C.R.] or in his hearing range, his biological Father or where he is, unless prior approval is granted by Mother in writing."[14]

On June 15, 2017, the mother filed her petition to terminate the father's parental rights.  Shortly thereafter, in October 2017, she and her fiancé, S.L., were

---

[13] *Id.*
[14] App. to Appellant's Opening Br. at 368.

married.  On June 27, 2018, after a hearing, the Family Court concluded that the mother had met her burden of establishing that the father had "failed to plan" for the child under 13 *Del. C.* § 1103(a)(5) and that it was in the best interest of the child to terminate the father's parental rights.

## II. Discussion

In *In re Stevens* this Court recognized that:

> Parental rights arise from a natural relationship and are fundamental liberties which the law has traditionally recognized.  Those rights may not be abrogated in the absence of the most compelling reasons.  In Delaware, the statutory standard is two-fold:  proof of an enumerated statutory ground and a determination that severing the parental tie would be in the best interest of the child.  This Court has consistently ruled that the statutory scheme recognizes "the parent's strong interest in his or her child" which will be terminated only upon "a showing, by clear and convincing evidence, that the parent is unable to meet the statute's guidelines." [15]

To terminate the father's parental rights for failure to plan for the child, the mother was required to establish by clear and convincing evidence that (1) termination of the father's parental rights is in the best interest of the child, (2) the father is not able, or has failed, to plan adequately for the child's physical needs or mental and emotional health and development, (3) the child resided in the mother's home for at least one year; and (4) the father is incapable of discharging parental

---

[15] *In re Stevens*, 652 A.2d 18, 24 (Del. 1995) (citations omitted).

8

responsibilities, and there appears to be little likelihood that the father will be able to discharge such parental responsibilities in the near future.[16] We have previously observed that "[t]hese criteria are concerned with basic needs of a healthy child" and are compelling reasons for terminating parental rights.[17]

The father first contends that the Family Court misapplied the requirement that it be shown that he had failed, or was unable, to plan adequately for the child's physical needs or mental and emotional health and development. It did so, he argues, by applying the definition of necessary care contained in 10 *Del. C.* § 901(17) as part of its analysis of the father's alleged failure to plan. Section 901(17) defines necessary care as "a type and degree of personalized attention that will tend to advance a child's physical, mental, emotional, moral and general well-being."[18] The first sentence of § 901 provides that the definitions set forth therein apply "[f]or the purposes of this chapter, unless the context indicates differently."[19] Section 1031 of Title 10 of the Delaware Code, contained in Chapter 9, exemplifies the use of the definition of necessary care. It authorizes the Family Court to "[o]rder a child's custodian to exercise such care and perform such acts as may be reasonably

---

[16] 13 *Del. C.* § 1103(a). The mother argues on appeal that the issues raised by the father have been waived because the father did not file a motion for reargument under Family Court Civil Rule 59 or a motion to reopen or for relief from the judgment under Family Court Rule 60. These arguments have no merit and we reject them.

[17] *In re Hanks*, 553 A.2d 1171, 1178 (Del. 1989).

[18] 10 *Del. C.* § 901(17).

[19] 10 *Del. C.* § 901.

necessary to insure that the child shall obey the law and receive necessary care."[20]

Necessary care focuses on a custodian's duty to give personalized attention to a child's well-being. The definition of necessary care, by the terms of the statute containing that definition, however, applies only to the provisions of Chapter 9 of Title 10, and there is no context which extends it to the provisions of 13 *Del. C.* § 1103(a)(5). Necessary care is not one of the criteria set forth in 13 *Del. C.* § 1103(a)(5) for determining whether a parent's parental rights should be terminated. The criteria of that section focus not on personalized attention but on a parent's responsibility to plan for the child's overall physical needs and mental and emotional health and development.[21]

It is evident from the Family Court's opinion that the court made material use of the Title 10 definition of necessary care in arriving at its determination that the father is unable, or has failed, to plan adequately for the child's physical needs or mental and emotional health and development. The Family Court reasoned that:

> The Court does not accept the suggestion that an incarcerated parent can provide for a child's "necessary care" as it relates to food, clothing, shelter, education, health care, medical care or other care necessary for the child's emotional, physical or mental health, or safety and general well-being by proxy through friends and family, however; even if the Court accepted that argument, there is no evidence Paternal grandparents or anyone on

---

[20] 10 *Del. C.* § 1031(2).
[21] *See* 13 *Del. C.* § 1103(a)(5).

Father's behalf provided for [C.R.'s] necessary care since September 2013.[22]

The court continued, noting "Father has been incarcerated and is unable to provide for [C.R.]'s necessary care."[23] The court described a number of daily activities which the father is unable to perform which have the effect of illustrating that he is not able to provide personalized attention to the child.[24] It then proceeded, quoting 10 *Del. C.* § 901(17), to state that:

> Though the father's definition may be "different," the relevant definition for these purposes is the ability to provide for [C.R.'s] necessary care, a "type and degree of personalized attention that will tend to advance a child's physical, mental, emotional, moral and general well-being" and more specifically, Father lacks the ability to provide for [C.R.]'s "physical needs or mental and emotional health and development."[25]

---

[22] *Termination Op.* at 24 (footnotes omitted). Whether an incarcerated parent can provide "necessary care" as that term is defined in Chapter 9 of Title 10 is an issue we need not address. In the termination of parental rights context, we approved a finding in another Family Court case that "although a person is incarcerated, such a person has means available to both contact the child and assist the child in satisfying her needs either directly to a limited extent but certainly indirectly through friends and relatives." *In re Jones*, 528 A.2d 1113, 1988 WL 5749, at *2 (Del. Jan. 18, 1988) (TABLE). Incarceration alone is not a basis for finding that a parent has failed or is unable to plan or that the termination of parental rights is in the child's best interests. *See Matter of Adoption of L.A.S.*, 631 A.2d 928, 936, (N.J. 1993) (concluding that, although "a parent's lengthy incarceration is a material factor that bears on whether parental rights should be terminated,…[such a decision] must be based on a broad inquiry into all the circumstances bearing on incarceration and criminality…").

[23] *Id.* at 25.

[24] We note that all non-custodial parents who live far away from their children—an increasingly prevalent phenomenon—are unable to take part in the activities the court enumerated (attending medical appointments and school activities, helping with homework, "soothing [C.R.] when he injures himself, comfort[ing] him after a bad dream, celebrat[ing] his success or provid[ing] him with a hug"). *Id.* In the case of a distant non-custodial parent, such an inability does not necessarily eliminate the parent's ability to plan for the child's overall physical needs and mental and emotional health and development.

[25] *Id.* at 25-26.

11

It appears to us that the court used the definition of necessary care from Chapter 9 of Title 10 to define the standard set forth in 13 *Del. C.* § 1103(a)(5). For the reasons explained above, doing so was error. That error is material and requires reversal.

The father has also asserted claims on appeal challenging the sufficiency of the evidence. Since the case is being remanded because of the Family Court's legal error, we do not address those claims here. The Family Court should address those claims in its remand proceedings.

In addition, on remand, the Family Court should determine whether compelling reasons exist to terminate the father's parental rights due to his alleged failure or inability to plan adequately for C.R., applying only the criteria set forth in 13 *Del. C.* § 1103(a)(5) and (a)(5)(b), and because it is in C.R.'s best interest. In determining whether the father has failed or is unable to plan, the court may not consider the lack of contact between the father and C.R. after August 2015. After that month, the mother engaged in persistent efforts to prevent any contact between the father and C.R., either directly or indirectly through the paternal grandparents. The Family Court itself effectively prevented any contact between the father and C.R. when it stayed its visitation order on January 4, 2017. Since April, 2017, any attempt by the father to contact C.R. would have violated a Family Court order. Under these circumstances, no fault can be assigned to the father for his lack of contact with the child since September 2015. If the court does find that the mother

12

has met her burden of establishing that father has failed to plan by clear and convincing evidence, then it should again consider whether termination of the father's parental rights is in the best interest of the child, applying all relevant factors including—but not necessarily limited to— the factors in 13 *Del. C.* § 722. Finally, we recommend that the Family Court consider appointing a *Frazer* attorney to speak for C.R. in the remand proceedings.[26]

The judgment of the Family Court is reversed and the case is remanded for further proceedings consistent with this opinion.[27] Jurisdiction is not retained.

---

[26] *In re Frazer*, 721 A.2d 920 (Del. 1998).
[27] We endorse the Chief Justice's view that the General Assembly should review the statute and make any changes it deems appropriate to express more clearly its intent regarding termination of parental rights proceedings initiated by a parent.

**SEITZ**, Chief Justice, with whom Justice **VALIHURA** joins, concurring.

I concur in the well-written opinion of the Majority finding that the Family Court should not have imported the "necessary care" standard from another statute into the termination of parental rights statute. I write separately because I believe the statute is in need of clarification when it comes to the standards to be applied by the Family Court when a private party and not the State seeks to terminate parental rights.

I.

As we all agree, when the court considers a request by the State or a private party to terminate a parent's rights over their child, the most fundamental of rights are at stake—a parent's right to care for and raise their child. This Court noted in *Daber v. Division of Child Protective Services*:

> Fewer rights are more sacred than those which derive from the parent-child relationship. A society which arrogates to itself the power to intervene and disrupt that relationship can do so only for the most compelling reasons necessary to correct or protect a child from circumstances which directly threaten or affect the minor's physical or emotional health. The State and its agencies are not in the business of determining or otherwise interfering with the parent-child relationship on any less substantial grounds.[28]

---

[28] 470 A.2d 723, 726 (Del. 1983); *see In re Burns*, 519 A.2d 638, 645 (Del. 1986) ("The parental right is a sacred one. It does not depend on societal standards or mores of lifestyle, age, economic achievement or sex.").

14

Under 13 *Del. C.* § 1103, the Family Court may terminate parental rights only if it finds that severing the parent-child relationship is in the best interests of the child and the statute's specific requirements are met.[29] The statute sets forth in detail the grounds for termination—voluntary relinquishment of parental rights, abandonment, mental incompetence, certain criminal convictions related to children, a "failure to plan" for the child's needs, prior termination of parental rights over the child's sibling, physical abuse, and the parent's intentional, reckless, or willful neglect that results in serious physical injury to the child.[30] Here, the Family Court decided that the father had not abandoned C.R. That holding has not been challenged on appeal. Thus, the only ground for termination of parental rights was the father's "failure to plan" for the needs of C.R.

## A.

As the Majority agrees, to terminate parental rights for failure to plan, there are two statutory requirements—the person with parental rights, the respondent, must fail "to plan adequately for the child's physical needs or mental and emotional health and development."[31] And second, at least one of the further-enumerated statutory conditions must be met. Those conditions depend on whether a child is "in

---

[29] 13 *Del. C.* § 1103(a).
[30] 13 *Del. C.* § 1103(a)(1)-(8).
[31] 13 *Del. C.* § 1103(a)(5).

15

the care of the Department or a licensed agency," or "in the home of a stepparent, guardian, permanent guardian or blood relative."[32]

When the child is in the care of a State agency, the statute has an extensive list of factors for the court to consider, such as a history of previous placements or abuse or neglect, extended or repeated incarceration, failure to provide adequate financial support, and the risk of continued emotional instability and physical risk to the child.[33] But, when the child is in the home of "a stepparent, guardian, permanent guardian or blood relative," two requirements must be met:

> 1.     The child has resided in the home of the stepparent, guardian, permanent guardian or blood relative for a period of at least 1 year, or for a period of 6 months in the case of an infant; and
>
> 2.     The Court finds the respondent is incapable of discharging parental responsibilities, and there appears to be little likelihood that the respondent will be able to discharge such parental responsibilities in the near future.[34]

B.

Looking first at the failure to plan requirement, the Majority holds that the Family Court erred when it applied the definition of "necessary care" from another statute to decide whether the father had failed to plan. I agree with the Majority's conclusion on this issue. But, I also understand why the Family Court might have

---

[32] *Id.*
[33] 13 *Del. C.* § 1103(a)(5)(a)(1)-(5).
[34] 13 *Del. C.* § 1103(a)(5)(b)(2).

been searching for a standard to apply when a party other than a State actor seeks to terminate parental rights. As noted earlier, the statute is specific when it comes to children under State supervision. In that situation, termination of parental rights for "failure to plan" typically occurs after the State has attempted to work with the party whose parental rights are at risk. A State agency creates a "case plan" that defines the steps a parent agrees to take, such as completing parenting courses, receiving treatment for substance abuse or mental health care, obtaining stable employment and housing, addressing domestic violence concerns, and other relevant considerations.[35] The Family Court then evaluates the parent's actions against the case plan to decide whether the parent has "failed to plan,"[36] often terminating parental rights solely on a failure to satisfy the case plan.[37]

But when, like here, one parent seeks to terminate the parental rights of the respondent, there is no "case plan" to use as a yardstick to measure the respondent's failure to plan. Instead, the Family Court is left to its own discretion to decide

---

[35] *See, e.g.*, *Dep't of Servs. for Children, Youth and their Families v. M.B.*, 2017 WL 5759944, at *10-11 (Del. Fam. Ct. Nov. 22, 2017).

[36] *See id.*; *see also Dep't of Servs. for Children, Youth and their Families v. L.K.*, 2018 WL 2986629, at *9 (Del. Fam. Ct. May 17, 2018) (considering "some of the standard elements of a reunification case plan" when the Father never received a case plan).

[37] *See, e.g.*, *id.*; *George v. Dep't of Servs. for Children, Youth and their Families*, 150 A.3d 768, 2016 WL 6302525, at *4 (Del. 2016) (affirming the Family Court's finding that a parent failed to plan by only completing 25% of the eight requirements in their case plan). *But cf., e.g.*, *Dep't of Servs. for Children, Youth and their Families v. C.B.C.*, 2019 WL 2452396, at *14 (Del. Fam. Ct. Mar. 6, 2019) (finding the father failed to plan based on his lack of involvement with DSCYF, failure to satisfy elements of his case plan, and his inconsistent and minimal contact with the child).

17

whether the respondent has "failed to plan."[38]  While the Family Court often applies its particular expertise in domestic matters, that is no substitute for articulated standards used to measure whether the respondent has failed to plan.  Admittedly, there are cases when the respondent has been so irresponsible that any attempt to plan would be meaningless.  But, there are other cases when planning is a possibility, but the respondent has no idea what standard they must meet before the Family Court imposes the ultimate sanction of termination.  Like State-initiated proceedings to terminate parental rights, I think the Family Court must exercise some kind of analogous case planning to allow the respondent to attempt to meet the court's view of "adequate" planning.

## C.

As explained earlier, before one parent can terminate the parental rights of another, the statute requires not only a "failure to plan," but also two further requirements—the child must be in the home "of a stepparent, guardian, permanent

---

[38] *See C.Y. v. A.B.*, 2017 WL 4410839, at *5 (Del. Fam. Ct. Sept. 1, 2017) (finding the father failed to plan because he could not safely care for the child, was not a caretaker of the child since infancy, did not attempt to contact the child for three years, did not contact the mother to check on the child, was not involved with the child's school or activities, provided few, if any, necessities, had no demonstrated bond with the child, and only sought visitation and custody after the mother informed the paternal grandmother that she planned to pursue stepparent adoption); *E.C.C. v. J.K.*, 2014 WL 4198848, at *10 (Del. Fam. Ct. Mar. 18, 2014) (finding the mother failed to plan because of extremely minimal visitation for three-plus years, no care for the child's physical needs, no financial support, no provision of clothing or toys for the child, and no housing stability); *cf. Acorn v. Laymen*, 2019 WL 5543040 (Del. Oct. 28, 2019) (affirming a finding of failure to plan brought by a foster parent turned-guardian after the parents failed to meet a case plan approved by Division of Family Services).

guardian or blood relative" for at least one year, or six months for an infant, and "the respondent is incapable of discharging parental responsibilities" with little likelihood that situation will change in the near future.[39] As to the first element—residing with a blood relative—it is unclear to me that the General Assembly intended to include a parent as a "blood relative" in this section. It is true that our Court has affirmed several Family Court decisions finding that a parent qualifies as a blood relative under the statute.[40] And a parent is obviously a blood relative. But, when "blood relative" is read in its proper statutory context, it seems to me that the General Assembly intended a "blood relative" to mean a blood relative other than a parent.

First, § 1103(a)(5) begins by addressing "[t]he parent or parents of a child," but omits "parent" from the second requirement's enumerated list of potential homes.[41] Then, in the following sections, the statute expressly distinguishes between the "parents of a child" and a "blood relative of a child." For instance, in addressing who can file a petition to terminate parental rights, 13 *Del. C.* § 1104(3) lists parents and blood relatives separately ("(3) Both parents of a child; (4) A blood relative of a child"). And, in 13 *Del. C.* § 1105(10), the statute once again distinguishes parents

---

[39] 13 *Del. C.* § 1103(a)(5)(b).
[40] *Moore v. Hall*, 89 A.3d 477, 2014 WL 1168742 (Del. Mar. 20, 2014); *Teachem v. Terry*, 56 A.3d 1041, 1050-51 (Del. 2012).
[41] *See In re Adoption of Swanson*, 623 A.2d 1095, 1097 (Del. 1993) ("[W]here, as here, provisions are expressly included in one part of a statute, but omitted from another, it is reasonable to conclude that the legislature was aware of the omission and intended it.").

from blood relatives ("A statement that petitioner has explored the possibility of placement of the child with blood relatives, if both parents' rights are being terminated . . . ."). It might be that the General Assembly intended the other enumerated grounds for termination—like abandonment—to suffice when it comes to a parent attempting to terminate the parental rights of another parent. In other words, in termination proceedings brought by a parent against a private party, a failure to plan might not apply as a ground for termination.

Even if we assume the General Assembly intended to treat parents as blood relatives under the statute, a second element must also be proven—the respondent must be found to be incapable of discharging their parental responsibilities.[42] The statute defines parental responsibilities as "the care, support and control of the child in a manner that provides for the child's necessary physical needs, including adequate food, clothing and shelter, and that also provides for the mental and emotional health and development of such child."[43] It is not altogether clear how this standard differs from a failure to plan.[44] It might be that a "failure to plan" involves a plan and whether it has been met. In contrast, the inability to discharge parental responsibilities might go to the more fundamental question whether the

---

[42] 13 *Del. C.* § 1103(a)(5)(b)(2).

[43] 13 *Del. C.* § 1101(10).

[44] Compare the failure to plan language—"plan adequately for the child's physical needs or mental and emotional health and development"—with the definition of parental responsibilities—". . . child's necessary physical needs, . . . [and] the mental and emotional health and development of the child." 13 *Del. C.* §§ 1101(10), 1103(a)(5).

respondent *can* meet that statutorily-defined standard presently and in the near future. In other words, even if the respondent fails to comply with a plan, the court should not terminate the respondent's parental rights for "failure to plan" unless the respondent is also "incapable of discharging parental responsibilities." Whether this interpretation is correct is far from clear under the statute in its present form.

## II.

I write this concurrence not to be critical of the Majority opinion. I agree with the Majority's view that the Family Court erred by importing the standards of 10 *Del. C.* § 901(17) into 11 *Del. C.* § 1103. But, I believe the termination of parental rights statute is unclear when applied to a private termination of parental rights proceeding. When it comes to fundamental rights like those at stake here, I would encourage an effort to review the statute and make the changes necessary to express clearly the intent of the General Assembly when it comes to private termination of parental rights proceedings.